### Martin CAVALIER

#### v.

### T. SMITH AND SON, INC. et al.

#### Civ. A. No. 78–342.

United States District Court, E. D. Louisiana.

Oct. 15, 1980.

George J. Kambur, New Orleans, La., for plaintiff.

Thomas W. Thorne, Jr., and Edward F. Kohnke, IV, New Orleans, La., for defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

#### Findings of Fact

1. In January of 1977, T. Smith contracted with the owners of the M/V Sei Shin to unload cargo from that vessel onto river barges.

2. To unload said vessel, T. Smith employed a longshore gang who were hired from the union hall and were paid on an hourly basis.

3. The derrick barge Patricia, owned and operated by T. Smith, is a navigable vessel, 200 feet in length, 56 feet in width and 11 foot depth, on which is mounted a traveling gantry crane. The vessel is designed for making heavy lifts. As used by T. Smith, the vast majority of its work is the loading and unloading of cargo to and from vessels, although on occasion it is used to make other lifts, e. g. ship's anchors, ship's machinery.

4. The derrick barge Patricia is crewed from a special pool of permanent employees of T. Smith, who are paid a fixed salary

with overtime and vacation pay and were not hired from the union hall. These crew members permanently worked only on derrick barges.

5. The crew of the Patricia are never intermingled and/or assigned to work in a longshore gang.

6. The duties of the crew of the Patricia were to maintain the vessel, paint and chip, tie up, cast off and to perform any duties necessary to carry out the function of the vessel.

7. On February 1, 1977, T. Smith was engaged in performing its contract to discharge the M/V Sei Shin, then berthed at the Louisiana Avenue Wharf. Plaintiff, Martin Cavalier, was a member of T. Smith's longshore gang, which was working inside the hatches of the Sei Shin hooking up the drafts of cargo. The Patricia was lifting the drafts, once hooked up by the longshoremen, out of the ship and landing them in the river barges where the drafts were unhooked by other longshoremen. Work commenced at 6:00 p. m., and the accident occurred at approximately 3:00 a. m. on February 1, 1977.

8. At approximately 3:00 a. m., plaintiff's gang was working in the No. 1 hatch hooking up drafts of 30 foot pipe in slings attached to the fall of the derrick. Anderson Nicholas, a member of the crew of the derrick, was standing over the No. 1 hatch, at the main deck of the Sei Shin, signaling Merlin Culver, the operator of the derrick crane who was also a member of the crew of the derrick, as he lifted the drafts of cargo out of the ship hold.

9. Through an error in judgment (negligence) of either the crane operator (Culver) or the flagman (Nicholas), the draft failed to clear the hatch coaming at the main deck, striking same and causing the pipes to slide out of the slings and fall into the hatch below, seriously injuring the plaintiff.

10. The plaintiff's injuries included an open comminuted fracture of his proximal left femur, multiple rib fractures, a fracture of his left inferior ischiopublic ramus, a dislocation of the symphysis pubis and of the right sacro–iliac joint.

11. As a result of plaintiff's injury, T. Smith, through Employers National Insurance Company (its compensation insurer), has incurred medical expenses and paid compensation benefits to plaintiff under the provisions of the Longshoremen's and Harbor Workers' Compensation Act.

12. Plaintiff has brought suit against T. Smith under § 905(b) of Longshoremen's and Harbor Workers' Compensation Act for injuries sustained in the accident. The plaintiff alleges that T. Smith is liable under 905(b) as owner of the vessel Patricia because of the negligence of the crew members. T. Smith defends alleging that plaintiff cannot recover because he was injured by employees providing stevedoring services.

*Conclusions of Law*

1. The specific issue before this court is whether the accident causing injury to plaintiff falls under the exclusion of 905(b) that provides "if such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel," so that the derrick barge Patricia and its owner, T. Smith and Son, are immune from a negligence action under 905(b).

2. The negligence of the Patricia is not disputed, nor is it disputed that the plaintiff is a person covered under the LHCA. Although the plaintiff was not providing stevedoring services to the Patricia, but, rather, the Sei Shin, the Patricia falls within the definition of vessel in the LHCA because it was a vessel "upon which or in connection with which any person entitled to benefits under this chapter suffers injury ... in the course of his employment," 33 U.S.C. § 902(21).

3. Although defendant, T. Smith and Son, is the employer of the plaintiff as well as the owner of the vessel, the Fifth Circuit held in *Smith v. M/V Captain Fred*, 546 F.2d 119 (C.A. 5th Cir., 1977), that a longshoreman may sue his employer qua vessel

under 905(b). Therefore, absent the applicability of the exclusion set out in the second sentence of 905(b), the plaintiff could recover in a negligence action against T. Smith and Son.

4. In *Captain Fred*, the court interpreted the following report of the House Committee as indicating that they intended the *Yaka* rule to survive the 1972 amendments of the LHCA:

> "The Committee has also recognized the need for special provisions to deal with a case where a longshoreman or ship builder or repairman is employed directly by the vessel. In such case, notwithstanding the fact that the vessel is the employer, the Supreme Court, in *Reed v. S. S. Yaka*, 373 U.S. 410 (83 S.Ct. 1349, 10 L.Ed.2d 448) (1963) and *Jackson v. Lykes Bros. Steamship Co.*, 386 U.S. 731 (87 S.Ct. 1419, 18 L.Ed.2d 488) (1967), held that the unseaworthiness remedy is available to the injured employee. *The Committee believes that the rights of an injured longshoreman or ship builder or repairman should not depend on whether he was employed directly by the vessel or by an independent contractor.* Accordingly, the bill provides in the case of a longshoreman who is employed directly by the vessel there will be no action for damages if the injury was caused by the negligence of persons engaged in performing longshoring services. Similar provisions are applicable to ship building or repair employees employed directly by the vessel. *The Committee's intent is that the same principles should apply in determining liability of the vessel which employs its own longshoremen or ship builders or repairmen as apply when an independent contractor employs such persons.*"

5. This passage has been analyzed by other courts as a guide to interpreting the meaning of the exclusions contained in 905(b). In *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), the U. S. Supreme Court, in dicta, said that the legislative intent was to "treat the vessel that provides its own stevedoring services just like other shipowners when and if it negligently causes injury as a shipowner and just like other stevedores when it negligently injures in the course of providing its own loading and unloading services." The Supreme Court construed the second sentence of 905(b) "to permit a third party suit against the vessel providing its own loading and unloading services when negligence in its nonstevedoring capacity contributes to the injury."

6. The Second Circuit Court of Appeals had occasion to consider the exclusion in the second sentence of 905(b) in *Smith v. Eastern Pile Driving*, 604 F.2d 789 (1979). That court said that "the key issue is whether the shipowner's employees who were at fault committed the negligent acts in their capacity as agents of the vessel on the one hand or as employees performing longshoring ... services on the other." The court found that in order for the exemption to apply, "the injured worker and the negligent employee must both have been performing the same function, whether it be longshoring, shipbuilding, repair work or ... some other task."

7. The Fourth Circuit Court of Appeals, citing the *Smith v. Eastern* case, came to the same conclusion as the Second Circuit in regards the second sentence of 905(b). *Richardson v. Norfolk Shipbuilding*, 621 F.2d 633 (1980). The *Richardson* case is very similar, factually, to the case at bar. In that case, two employees of Norfolk were doing repair work on the U.S.S. Nashville and in order to do their work, they were suspended in a tray along the ship by means of a crane. The crane was operated by an employee of Norfolk and was positioned on a wooden barge owned by Norfolk. The men were injured by the fault of the crane operator. Plaintiffs argued that they should recover because they were not providing repair services to the barge, but were part of the crew. The court rejected that argument and held that the accident occurred while the employees were acting in the capacity of repairmen and, therefore, could not recover because of the exclusion of 905(b).

8. In the instant case, plaintiff is a longshoreman who was hired by T. Smith and Son for the sole purpose of assisting in stevedoring services being provided to the Sei Shin. The plaintiff was injured by regular employees of T. Smith and Son who were crew members of the stevedoring vessel and who were at that time assisting in the stevedoring operations.

9. The parties have stipulated that if either the crane operator or the flagman had been injured in the present accident, instead of plaintiff, and elected to sue T. Smith and Son under the Jones Act, he would be adjudged a seaman as a matter of law. They have also stipulated that if either the crane operator or flagman had been injured in the present accident, instead of plaintiff, and elected to sue T. Smith and Son for compensation benefits under the LHCA, he would be adjudged a non–seaman and entitled to benefits under the Act on the grounds that his primary duty was that of longshoreman.

10. The court recognizes these stipulations as part of the record, however, what legal status these employees may be entitled to has no bearing on whether the exclusion should apply to the accident involved. As demonstrated by the cases cited earlier, the proper inquiry is in what capacity was the crane operator or the flagman acting at the time the accident occurred. At the time of the injury, one tortfeasor was operating a crane to remove cargo from the Sei Shin's hold and the other was signaling the crane operator. There is no doubt that they were engaged in providing stevedoring services to the vessel at the time they negligently injured the plaintiff.

11. In the House Committee Report quoted earlier, Congress made it clear that all workers covered by the act should have the same rights no matter who the owner of the vessel was. By this, Congress intended that not only should an injured worker not be precluded from a negligence action against the vessel merely because it was owned by his employer, but also intended that a worker not be given any greater rights because his employer happened to be the vessel owner. The purpose of the exclusions was to prevent the latter from happening.

12. If the plaintiff were to be allowed to recover in this case, the consistency of treatment would be destroyed. A longshoreman injured, as the plaintiff was here, from the negligent operation of a floating crane would recover, but one injured through the negligent operation of a shore–based crane would not. Such a result would create a purely fortuitous distinction not intended by the drafters of 905(b).

13. Therefore, for the above reasons, the plaintiff is not entitled to a negligence action against T. Smith and Son because he was injured by employees providing stevedoring services.

*ADDENDUM*

Having concluded that the stipulated facts do not accord plaintiff a cause of action against T. Smith and Son under 905(b), yet taking into account that a reviewing court will have a completely equivalent ability to resolve this issue, I believe that judicial economy and the interests of justice are best served if I turn to a full consideration of plaintiff's damage claim.

Cavalier suffered severe and painful injuries as a result of the accident on February 1, 1977. The steel pipes struck his left leg, knocking him down and among other pipes stowed in the hold of the ship and also caused injury to his head, ribs and hip. He sustained a scalp laceration, compound fracture of the left femur, multiple fractures of his ribs on the left side, separation of the symphysis pubis and fracture of the inferior part of the left pubis.

He was an inpatient at Touro Infirmary and later at Ochsner Foundation Hospital for a total of more than two months. When he was first admitted at Touro, surgery was performed and a traction pin was inserted into the proximal tibia. The operation wound was left open and the left leg was placed in traction for 17 days in order to allow drainage of the wound. The plaintiff was given a blood transfusion for exces-

sive blood loss and had an indwelling catheter in place. He received IPPB treatments and blow bottle treatments to expand his lungs, which caused pain to his fractured ribs, in order to prevent pneumonia. He also wore an anti-embolism stocking on his right leg to prevent the formation of blood clots.

The plaintiff was transferred to Ochsner on February 17, 1977. On March 7, 1977, he had an open reduction and Schneider nailing of the left femoral fracture. The thigh and hip wounds were sutured and drainage tubing was inserted. He was discharged from Ochsner on April 16 on crutches and still wearing a TED hose to prevent blood clots.

Thereafter, he was seen by Dr. A. William Dunn on an outpatient basis at Ochsner through November of 1978. Dr. Dunn saw him on numerous occasions during this period for complaints of leg and back pain, and, on March 20, 1978, Dr. Dunn diagnosed traumatic chondromalacia of the patella resulting from injuries sustained.

On March 28, 1978, Cavalier was readmitted to Ochsner Foundation Hospital for the removal of the Schneider nail and for a left patellectomy. A cylinder cast was applied, and he was discharged from the hospital on crutches on April 3, 1978. He was then placed on physical therapy for whirlpool and knee exercises and in the latter part of May was walking with the aid of a cane.

Dr. Dunn reported that plaintiff had reached maximum recovery by late November, 1978. Although Cavalier still complained of pain in his back and knee at that time, Dr. Dunn found that the plaintiff had no trouble with his left hip and thigh, had full motion of his left knee and a 20% loss of internal rotation range of his left hip. That physician concluded that plaintiff would not, thereafter, be physically able to return to work as a longshoreman. Dr. Dunn found him to be depressed as a result of the accident and resulting injuries and referred him to a psychiatrist, Dr. Richard Mestayer.

Plaintiff was treated by Dr. Mestayer for depression from late 1978 through December, 1979. When Dr. Mestayer first saw plaintiff, he reported that Cavalier was severely depressed and had suicidal feelings which were secondary to the injury of February 1, 1977. He was hospitalized on November 30, 1978, for this depression and was discharged on December 24, 1978; however, the plaintiff continued to experience depression during 1979. As early as January, 1979, Dr. Mestayer had recommended that the plaintiff seek some sort of employment, but this was not affirmatively acted upon.

In November, 1979, the plaintiff consulted Dr. Essam Elmorshidy for back pain which he (Cavalier) felt was related to the injuries received in the accident. On February 7, 1980, he was admitted to Methodist Hospital by Dr. Elmorshidy for evaluation of the chronic back pain and lumbar disc syndrome. He was treated with chemotherapy and pelvic traction and was discharged approximately a week later. Plaintiff was still being treated for back pain in August, 1980.

The plaintiff was seen by Dr. James Williams on August 20, 1980, approximately three weeks before trial. Dr. Williams found that Cavalier had some diastasis of the symphysis pubis and a 20% partial permanent disability of the left knee as a result of the patellectomy.

From all of the above, I am convinced that plaintiff has experienced significant, long-term pain and suffering and that he will continue to suffer some intermittant pain and will continue to experience physical disabilities which will effectively obviate his returning to heavy work similar to his pre-injury status as a longshoreman. Accordingly, I believe that had plaintiff prevailed, he would have been entitled to an award for past, present and future pain, suffering and disability in the amount of $110,000.

Furthermore, I believe that Cavalier would have been entitled to certain medical expenses which have been incurred but not, as yet, paid in his behalf. These include:

| Dr. Essam Elmorshidy | $ 306.00 |
| Dr. Richard Mestayer | 580.08 |
| Methodist Hospital | 1,574.65 |
| Ochsner Foundation Hospital | 999.99 |
| | $3,460.72 |

Finally, had plaintiff prevailed, he would be entitled to loss of wages, which I will discuss in further detail as follows: I conclude that plaintiff's annualized average income prior to his injury was $13,500 per annum, or $1,125 per month. Having concluded that Cavalier was totally disabled from the date of the accident until the end of 1978, I find that during that period he sustained a wage loss of $25,000. I further conclude, based upon the medical and related testimony, that Cavalier, though able to return to limited employment (which he did not choose to do) in 1979, would have (even if he had done so) incurred a wage loss of $8,000 and, likewise, in the first half of 1980, $4,000. Thus, I conclude that Cavalier has experienced an overall past wage loss of $37,000.

Though plaintiff has a college degree and was, in my view, able, at the time of trial, to return to gainful employment in various capacities, he has not seen fit to do so. He contends that inside desk work makes him nervous and that, as a matter of fact, he sought employment as a longshoreman to get away from the kind of inside desk work that he still seeks to avoid. These contentions may be accurate, and, yet, it is obvious to me that Cavalier has both the physical and mental capacity to adequately perform in a substantial spectrum of job opportunities. Furthermore, it is clear to me from the evidence adduced at the time of trial that Cavalier has been operating a taxicab business for several months and, in the course of same, has either operated his own taxicab and/or operated other owned vehicles through the use of other personnel who pay a certain overriding figure to Cavalier for the use of those vehicles which Cavalier has obtained and converted to taxicabs.

Even so, it is apparent that Cavalier will not be able to return to work as a longshoreman and will, more likely than not, over his work life expectancy, experience a future wage loss which, though not susceptible to categoric determination, will be, in my estimation, on the order of $50,000.

Accordingly, had I reached a different conclusion with respect to liability, I would have awarded the following:

| | |
| Past, present and future pain and suffering and permanent disability | $110,000.00 |
| Medical and hospital expenses | $ 3,460.72 |
| Past, present and future wage loss | $ 87,000.00 |
| | $200,460.72. |